**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re<br><br>**INDIAN NATIONAL FINALS RODEO**<br>**INC & INDIAN NATIONAL FINALS**<br>**RODEO ASSOCIATION INC,**<br><br>Debtor. | Case No.  **11-60113-11** |

# MEMORANDUM OF DECISION

At Butte in said District this 28th day of June, 2011.

The following matters are pending in this Chapter 11 case are: final approval of the

Debtor's Amended Disclosure Statement; and confirmation of Debtor's Chapter 11 Plan of

Reorganization, as modified.  Objections to confirmation were filed by the largest unsecured

creditor Apache Gold Casino Resort (hereinafter "Apache Gold").  The Court conducted hearings

on these matters after due notice at Great Falls on May 20, 2011, and on June 10, 2011[1].  The

Debtor was represented at the hearing by attorney Steven M. Johnson ("Johnson") of Great Falls,

and Debtor's general manager Donna Hoyt ("Hoyt") testified.  Apache Gold was represented by

---

[1]No additional testimony or exhibits were offered on June 10, 2011.  In addition the Court
took judicial notice of the testimony and Debtor's Exhibits 6, 7, 8, 9, 10, 11, and 12 admitted at
the hearing held on April 15, 2011.

1

attorney Gary S. Deschenes ("Deschenes") of Great Falls.  Exhibits ("Ex.") 13, 14, 15, 16, 17,

18, 19, 20, 21, 22, 23, and 34 were admitted into evidence without objection.  At the conclusion

of the parties' cases-in-chief the Court took both matters under advisement.  After review of the

record and applicable law, Apache Gold's objections will be overruled; final approval will be

granted to Debtor's Amended Disclosure Statement (Docket No. 92); and the Debtor's modified

Plan will be confirmed by separate Order.

This Court has exclusive jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).

Confirmation of Debtor's Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).  This

memorandum includes the Court's findings of fact and conclusions of law.

The ballot report (Docket No. 12) reflects and this Court finds that all ballots filed in

Class II voted to accept Debtor's Plan, in the total amount of $40,256.  Apache Gold voted to

reject the Plan in Class I in the amount of $275,000.  Therefore, if the separate classification of

Apache Gold's claim is allowed, Debtor satisfies the requirement of 11 U.S.C. § 1129(a)(10) that

at least one class of claims that is impaired under the Plan has accepted the Plan.


**FACTS**

The Debtor ("INFR") was founded in 1976 to promote Native American rodeo.  Hoyt has

been general manager of INFR for 9 years.  She testified that previously there were five Indian

rodeo associations which came together to form INFR.  She testified that INFR is a Montana

corporation and registered as a nonprofit under § 501(c)(3) of the Internal Revenue Code.  INFR

has no shareholders.  INFR's office is located in office space located at and donated by the

Blackfoot Community College in Browning, Montana, pursuant to written leases.

2

Hoyt testified that INFR has a board of seven commissioners in the United States and Canada who are all volunteers, and who are paid no salary. INFR has two (2) employees, and Hoyt testified that otherwise the work of INFR putting on rodeos is done by volunteers. INFR uses Quickbooks for its recordkeeping.

INFR has eleven regions in the USA and Canada, each of which has an elected officer. Each region signs a contract with INFR to hold rodeos. Hoyt testified that INFR charges all eleven regions a $3,000 regional fee per year.

Hoyt testified that the regions hold six regional rodeos per year, and INFR runs the national finals rodeo near the end of the year. At the regional rodeos INFR offers prize money in each event in the sum of $200, and the INFR finals rodeo must have at least $2,000 in prize money for each event. Contestants who wish to participate in INFR rodeos must be members who pay INFR different membership fees according to their category. Hoyt testified that Membership fees range from $50 for junior memberships and personnel memberships, to $80 for senior members, and $200 for INFR members. Half of the membership fees go to INFR's office, and the other half is distributed to each region. Members are not paid dividends by INFR.

Contestants are charged $5 per rodeo event entry at the regional rodeos. Qualifiers for the national finals pay $300 per event entry. Hoyt testified that the entry fees are earmarked for payment of prize money to the competitors at the finals rodeo, and that those fees cannot be used by INFR for any other purpose.

The goal of members in the regional rodeos is to qualify for the national finals rodeo. Hoyt testified that each of the eleven regions sends at least two qualifiers to the national finals rodeo. At the finals 33 contestants compete in each of the nine rodeo events; junior and senior

3

events are also conducted.  Hoyt testified that a total of 500 contestants come to the national finals rodeo to participate.

INFR receives additional funds by entering into written sponsorship agreements with sponsors.  Hoyt testified that sponsorship funds are earmarked for prize money, or to pay expenses for the finals rodeo.  She emphasized, including under cross examination, that sponsorship funds cannot be used by INFR for other than the earmarked purpose.  Her testimony on this point is uncontroverted.  Apache Gold did not initiate an adversary proceeding to determine the validity or extent of the parties' interests in sponsorship funds under F.R.B.P. 7001(2).

Hoyt testified that INFR sells sponsorship packets of several types, including: $5,000 for a banner; $7,500 for barrel covers; $10,000 for a chute logo; $25,000 for contestant jackets; and $30,000 for a purse award.  INFR maintains a spreadsheet to keep track of sponsor records.  Hoyt testified that $25,000 was given to INFR by the South Dakota region for the purpose of prize money.  In return, Hoyt testified, sponsors get name recognition and VIP passes to the national finals rodeo.

Hoyt testified that INFR's national finals rodeo has been held for the last 3 years in Las Vegas.  Before that INFR held the rodeo at the Apache Gold Casino Resort, which is located on the San Carlos Reservation in Arizona.  Hoyt testified that INFR had entered into a ten year contract in 2006 with Apache Gold to host the finals rodeo.  INFR breached that contract.

Ex. 15, 16, and 17 are profit and loss ("P&L") statements for the finals rodeo when it was held in San Carlos in the years 2005, 2006, and 2007.  Ex. 15 shows a positive net income in 2005 in the sum of $8,740.14.  Ex. 16 shows a net loss in the amount of -$13,028.75 for the year

4

2006.  Ex. 17 shows a larger loss in the amount of -$29,857.49 for the year 2007.

When asked why INFR moved to Las Vegas, Hoyt testified that INFR was losing money on the finals held at Apache Gold.  She testified that Apache Gold did not have enough rooms on site to accommodate attendees, the attendance at the national finals rodeo declined each year.

After INFR moved to Las Vegas, Apache Gold sued INFR in the tribal court of the San Carlos Reservation for breach of contract.  The parties entered into a stipulation to resolve the matter in August of 2008.  INFR paid the first payment to Apache Gold in the amount of $25,000.00, but failed to make any subsequent payments.  The San Carlos Tribal Court entered judgment against INFR based on the unpaid settlement.  That judgment in turn was entered in the Eighth Judicial District Court, Clark County Nevada as a foreign judgment in case no. A-10-626221.

Hoyt testified that attendance at the national finals rodeo increased after the move to Las Vegas.  She stated that sponsorships amounts also increased since the move, and explained that because Las Vegas has more hotels and accommodations, some tribes now purchase blocks of tickets to distribute to their members.

Hoyt testified that revenues increased when the finals were moved to Las Vegas.  Ex. 22 shows the revenues for the finals rodeo in the years 2005 through 2010, at both the San Carlos reservation and in Las Vegas.  Ex. 22 shows that the ticket sales increased every year since INFR moved to Las Vegas in 2008, from $110,660 in 2008 to $170,717 in 2010.  Ex. 22 shows that sponsorship amounts varied.  Sponsorships decreased while INFR held the finals at San Carlos from $92,000 in 2005 to $67,058.00 in 2008, the last year at San Carlos.  In 2008 sponsorships totaled $381,366.26, and declined thereafter to $270,363.85 in 2010.  Ex. 22.  Ex. 23 shows total

5

ticket sales and sponsorships for the years when the finals was held in San Carlos in the amount of $429,304, versus $1,369,937 in total ticket sales and sponsorships when the finals was held in Las Vegas.

Ex. 18 and 19 are settlement sheets for the finals rodeo for the years 2008 and 2009. Ex. 18 shows total revenues and expenses, and shows total 2008 sponsors in the amount of $274,000. Some sponsorships are earmarked for specific tasks, for example the $5,000 amounts for 2008 sponsors Lagune Construction Company and Navajo Nation Parks and Recreation described on Ex. 18 as for "Arena Banner." Ex. 19 shows total sponsorships for the year 2009, and their "Sponsor Type" on the right hand column, but does not show the total amount of sponsorships.

Hoyt testified that in the year 2010 INFR had a positive cash flow. Ex. 13 is the P&L for the finals in the year 2010, and it shows a negative net income in the amount of -$12,379.01. Ex. 20 is the event settlement sheet for 2010, including a list of sponsorships for that year which includes Willie John and Eugene Creighton. Ex. 21 is an example of the INFR Sponsor Contract for the year 2010, naming the sponsor as Fort McDowell Yavapai Nation in the amount of $15,000 for "Champion Coats." Under cross examination Hoyt admitted that the South Point Casino in Las Vegas, where INFR moved the finals, accepted a sponsorship in lieu of payment of some debt.

For the 2010 national finals rodeo in Las Vegas, INFR had 500 members coming to Las Vegas to compete in the rodeo, which was to begin in November. INFR was holding prize money paid by members' entry fees, which was earmarked for prize money for the event winners. Hoyt testified that Apache Gold did not have a lien on the purse funds, but that Apache Gold tried to levy against the prize money in execution of its judgment before the finals was held in

6

2010.  She testified that, if Apache Gold had succeeded in levying against the prize money, INFR
would have had to cancel the finals rodeo.

  INFR filed its Chapter 11 petition on November 5, 2010, in the United States Bankruptcy
Court for the District of Nevada in Las Vegas.  Hoyt testified she filed the petition in Las Vegas
because she was in Las Vegas at the time preparing for the national finals.  She testified that
INFR filed the petition in order to restructure its debts, to show good faith and to provide a plan
for payment to Apache Gold.

  The 2010 INFR rodeo took place as scheduled.  Ex. 9 states that the total revenue from
the rodeo was $584,954.75, including $165,589 from ticket sales and $275,243.75 from 2010
sponsors.  Ex. 10 states the 2010 event expenses in the total amount of $582,240.66.

  Ex. 11 was prepared by Hoyt, and she described Ex. 11 as the 2010 revenues and
expenses for INFR's own operations, as distinguished from the revenue and expenses from the
2010 national finals rodeo.  Ex. 11 shows expenses in the total amount of $138,150 for 2010, and
revenue of $140,215.73, including $85,912 from membership fees.

  Debtor filed its Schedules and Statement of Financial Affairs on December 2, 2010, and
later filed amendments.  Schedule A lists no real property, and Hoyt testified that INFR owns no
real estate.  The original Schedule B lists personal property with a total value of $3,190 which
consists of office furniture, computers and computer equipment.  At item 2 calling for checking,
savings or other accounts Debtor listed $0.00 in Native American Bank – Browning Branch.
Hoyt testified that when she signed the Debtor's Schedules she did not notice that item 2 stated
$0.00 in the bank account.  The only other personal property listed on Schedule B is at item 35
("Other personal property of any kind not already listed.") where the Debtor described "Rights to

7

Indian National Finals Rodeo" with a value stated as "Unknown." Hoyt testified that the Debtor

owns the INFR name, but she was not aware of any market value for the name. She testified that

the Debtor does not have a registered trademark for its name, and she has not ever tried to market

the INFR name.

After Apache Gold filed its motion to dismiss, Debtor filed an amended Schedule B on

April 12, 2011. Ex. 6. The Amended Schedule B lists personal property in the total amount of

$81,767.66. The differences from the original Schedule B are at the entries for item 1 ("Cash on

hand") and item 2 (accounts).

The entry on item 1 on amended Schedule B remains $0.00, but Debtor added the

following description:

> A cashier's check in the amount of $170,000 has been drawn on Debtor's account
> on 11/1/10 and delivered to South Point Casino to hold in trust as prize money to
> contestants of the November 2010 rodeo event to be held at South Point Casino.
> Debtor had held those funds in trust prepetition for the 2010 Indian National
> Finals Rodeo annual event in Las Vegas.

Hoyt agreed with the above-quoted statement in her direct examination.

Ex. 8 is INFR's bank statement for the period of November 2010. Hoyt testified that all

sponsorship money was deposited into the account. Ex. 8 shows the $170,000 check drawn on

11/1/10. Hoyt testified that the $170,000 came from the entry fees, and that she carried a

cashier's check for the prize money instead of using a wire transfer in 2010 because the cashier's

check was cheaper, and because she departed for Las Vegas earlier than usual. She testified that

she delivered the $170,000 check to South Point Casino before the petition date, and repeated

that it was earmarked as prize money. Under cross examination, Hoyt testified that she told her

bankruptcy attorney about the cashier's check in Las Vegas, and that she would have disclosed

8

the existence of the cashier's check at any time, including at the 11 U.S.C. § 341(a) meeting of creditors.

The entry on Item 2 (accounts) of amended Schedule B changed from $0.00 in the checking account at Native American Bank – Browning Branch, to $78,577.66. The accompanying description states:

> These funds on deposit in Debtor's Native American Bank account consisted of monies held in trust by the Debtor and not belonging to the Debtor. They were sponsor funds delivered to the Debtor and earmarked for use to pay expenses for conducting the Debtor's Finals Rodeo event in Las Vegas. The funds on deposit consist of trust funds for which checks had been written pre-petition to pay for personnel that were retained to work at the Finals Rodeo event, but these pre-petition checks cleared the bank post-petition. A listing of the specific pre-petition check numbers making up those trust funds that cleared the bank post-petition is shown on the list attached to this Amended Schedule B.

Hoyt testified that certain finals expenses were paid from ticket sales. The attachment to Ex. 6 lists nine checks written in November of 2011[2], for the rodeo commencing on November 6, 2010, in the grand total of $83,520. Hoyt testified that when she left for Las Vegas on November 1, 2010, to prepare for the finals, she had printed the $83,520 worth of checks for her personnel and other expenses for the rodeo, and that $78,000 of the prize money in the bank was from sponsorships which were earmarked for that purpose. Hoyt went through the checks on the attachment to Ex. 6, and testified that they were all written before the petition date, and paid from earmarked money. When asked about check no. 4094 on the last page of Ex. 6, Hoyt testified that that $60,000 was spent for expenses in preparation for the finals rodeo, such as for cleaning stalls, prior to the filing of the Chapter 11 petition.

On cross examination Deschenes asked Hoyt about the approximately $250,000 in funds

---

[2]The dates 11/1/11 and 11/3/11 on the attachment clearly are typos.

not listed on the original Schedule B.  Hoyt repeated her testimony that the funds were from

sponsorship funds and fees held in trust and earmarked as prize money and to pay the expenses

of the finals rodeo.

No secured claims are listed on Ex. D.  No priority claims are listed on Schedule E.

Schedule F originally listed Apache Gold as the only unsecured nonpriority claim in the

total amount of $275,000.  Debtor amended Schedule F on December 30, 2010, and amended it

again on April 13, 2011 (Ex. 7) adding seven unsecured claims raising the total to $316,032.60,

none of which are disputed.  The added claims include:  David C. Amesbury, Inc. ($2,508.00)

described as "pre-petition legal fees"; Dr. Steven Williamson ($3,400) for "Expenses for working

Indian National Finals Rodeo"; Eugene J. Creighton ($7,000.00) described as "Loan"; Jessie

Jaymes Silversmiths ($475.00) for "Go Round Tie Buckle"; Native Solutions Consulting

($776.60) for "Consulting Service"; Tribal Print Source ($2,348.00) for "Printing of Rodeo

Programs"; and Willie Johns ($25,000) for "2007 and 2010 World Champion Saddles."

Hoyt testified that David C. Amesbury, Inc., was INFR's attorney in Nevada and his

claim for $2,508 was all for prepetition legal fees.  She testified that Dr. Steven Williamson is a

volunteer physician for the finals rodeo, that his claim for $3,400 is for his travel and expenses

and was incurred prepetition, and that he will continue to work the finals rodeo as a volunteer

physician at the 2011 finals.  She testified that Eugene J. Creighton's claim for $7,000 (described

on Ex. 7 as "loan") was for a portion of belt buckles for the 2010 event, and that the Debtor relies

on Creighton for his services.  She testified that the $776.60 claim for Native Solutions

Consulting was for marketing consulting fees, all incurred prepetition.  She testified that Tribal

Print Source's claim of $2,348 was all incurred prepetition for printing the finals rodeo programs.

10

Hoyt testified that the $25,000 claim of Willie Johns was all incurred prepetition in 2007 and 2010 when he made loans to INFR.  She testified that Johns is a member and commissioner of INFR.  The bank statement, Ex. 8 includes a $10,000 wire transfer from Willie Johns into INFR's account dated 11/3/10.  Hoyt testified that was a loan transfer, and she answered "No" when asked if Johns was repaid part of his claim prepetition.  Under cross examination about the other creditors, Hoyt testified that Dr. Williamson was not a sponsor.  Eugene Creighton has a relationship with INFR as a coordinator, but is not on the board.

Debtor amended its SOFA on December 8, 2010.  Question 1 of the SOFA lists income from the INFR rodeo gross income and membership income for the years 2008, 2009 and 2010 in the amounts of $283,789.00, $73,048.00, and $413,330.59, respectively.  At question 2 Debtor lists income from contributions for 2008, 2009, and 2010 in the amounts of $381,366.00, $562,394.00, and $198,969.85, respectively.

On cross examination about that decline in contributions, Hoyt testified that contributions for 2010 may have been received in December of 2009.  She explained that sponsorships are cut off for recordkeeping purposes in November, and that sponsorships which are received in December are included in the following year.   Ex. C to INFR's first Disclosure Statement (Dkt. 62) includes INFR's profit & loss ("P&L") for the year 2010.  The 2010 P&L shows $270,363.85 in sponsorship money received in 2010, broken down between $12,894.85 in 2009 sponsorships and $257,469 in 2010 sponsorships.  Hoyt admitted that the $257,469 on Ex. C is not the same amount as the $198,969.85 in 2010 contributions stated at No. 2 on the SOFA, and she agreed to provide more information.  Under redirect examination Hoyt explained that the 2010 contributions on the SOFA in the amount of $198,969.85 were as of December 2, 2010, when the

11

SOFA was filed, while the $257,469 in 2010 sponsorships stated on Ex. C to the Disclosure
Statement were through the end of 2010, reflecting the entire year, including sponsorship money
received in December 2010.

Ex. D to Dkt. 62 is the P&L for 2008 and 2009. That shows 2008 sponsorships received
in the amount of $381,366.25, and 2009 sponsorships in the amount of $300,350, both of which
Hoyt testified were while INFR held its finals rodeo in Las Vegas. Ex. D shows a positive net
income for INFR for the year 2008 in the amount of $1,796.75, and $29,052.44 for the year 2009.
Ex. C to Dkt. 62, by contrast, shows a negative net income for the year 2010 in the amount of -
$12,379.01.

This case was transferred to this Court from Nevada by the Nevada bankruptcy court on
January 25, 2011. Apache Gold filed the only Proof of Claim in this case, on May 19, 2011.
Claim No. 1 asserts an unsecured nonpriority claim in the amount of $340,094.66 based on the
judgment, comprised of the $275,000 judgment amount, plus prejudgment interest and attorney
fees. Hoyt testified that the Debtor has no dispute with Apache Gold's $275,000 claim.

Debtor filed its Disclosure Statement and Chapter 11 Plan of Reorganization (Dkt. 61) on
March 3, 2011. Debtor filed an Amended Disclosure Statement on April 21, 2011, which the
Court conditionally approved by Order entered on April 21, 2011. On May 16, 2011, Debtor
filed a stipulation with the Office of U.S. Trustee for modification of the Plan, and on May 25,
2011, Debtor filed its First Amended Chapter 11 Plan (hereinafter the "Plan"), which
necessitated holding the June 10, 2011, hearing.

The original Plan (Dkt. 61) provides at page 4, Article II "Classification of Claims" for
two classes of claims: Class One which is the allowed unsecured claim of Apache Gold, and

12

Class Two comprised of allowed unsecured claims of less than $10,000.  Article IV provides at

4.02 that Apache Gold shall be paid an aggregate of 50% of its allowed claim of $275,000, or

$137,500, payable over 7 annual installments of $19,643 starting December 1, 2012, and for six

more years thereafter.  The amended Plan (Dkt. 127) amends section 4.02 to clarify that Apache

Gold will be paid a total amount of $137,500, with no interest in seven annual installments

starting in 2012.  Under cross examination Hoyt was asked why the Debtor cannot make any

payment to Apache Gold in 2011.  Hoyt answered that the Debtor has approximately $75,000[3] in

bankruptcy and legal fees incurred in Montana and Nevada[4], travel costs, and expenses, to pay

this year, and cannot afford to pay Apache Gold until next year.  The Plan further provides that

Apache Gold's judgment will be extinguished on the effective date of the Plan and be void,

discharged and unenforceable.  Hoyt testified that the Debtor cannot pay Apache Gold in full

based on its cash flow, and Debtor is not willing to pay Apache Gold after 8 years because it

wants closure.

The Court inquired about Apache Gold's Proof of Claim, and Johnson stated that the

Debtor may object to Apache Gold's claim because of the inclusion of attorney fees.  Hoyt

answered "No" when asked if it was possible for the Debtor to pay Apache Gold's claim in full,

and she testified that the size of Apache Gold's claim makes it different from the other unsecured

claims.

---

[3]Under questioning by the Court, Hoyt testified that the $75,000 is a "ballpark figure" and that some of the fees have been paid.  There are also undetermined fees for the accountant employed by the estate.

[4]The Nevada bankruptcy court retained jurisdiction over the fee application filed by Debtor's bankruptcy attorney in Nevada, and the court recently approved approximately $11,455 in fees plus $1,057 in costs.

Class Two will be paid the full amounts of their allowed claims without interest in eight annual installments, or alternatively 50% of such claims in three annual installments, beginning December 1, 2011.  Hoyt testified that Apache Gold is treated in Class One because it is a judgment claim, while Class Two creditors are creditors who have not sued INFR for payment. She testified that the Debtor is relying on the support of the Class Two creditors for its continued operations and reorganization.  She testified that Class Two creditors' claims are much smaller amounts, and that the Debtor wants to pay them in full so that they will continue to work with and support INFR at the finals rodeos.

Hoyt estimated the plan payments would total approximately $25,000 per year, which leaves the Debtor with a cushion based upon its historical financial performance.  She testified that the Plan is based on cost cutting and historic contributions by members, but not on increased contributions although that is possible.

Ex. 12 is INFR's projected budget for the 2011[5] INFR National Finals rodeo.  Hoyt answered "No" when asked if Ex. 12 is a projection for other future years, but stated that Ex. 12 is a typical year.  Ex. 12 projects revenues in the total amount of $642,500 from sponsorships ($350,000), ticket sales ($200,000) and other revenue sources.  Under cross examination Hoyt testified that she projects Debtor's ticket sales to increase in 2011, but that she does not project sponsorships to increase from the $350,000 on Ex. 12, although she is hopeful.  Hoyt arrived at the projections on Ex. 12 by taking 2010 revenues and increasing them by 8.5 percent (8.5%).

---

[5]Ex. 12 is headed with the phrase "2011 Projected Budget."  Nevertheless, on re-cross examination Apache Gold's counsel confused Hoyt into testifying that Ex. 12 was for 2010.  Ex. 12 says what it says.  Hoyt took the 2010 rodeo budget and made adjustments in the second column for "Cut back" and increased projected revenues.

14

Hoyt testified that so far in 2011 she has received $100,000 in sponsorships, but have only $50,000 in the DIP account, and that she has held off soliciting sponsorships because of this bankruptcy. She testified that the Debtor's contributors and purchasers of sponsorships are aware of this bankruptcy case and are concerned about the future. Contributions are cyclical, she testified, and they pick up in the summer when rodeo season begins and continue until the beginning of November.

The projected expenses on Ex. 12 total $582,240.66. Hoyt testified that the expenses came from the actual costs she recorded from the 2010 finals, and that the "Cut back" column next to expenses on Ex. 12 shows where she can further cut expenses by a total of $45,600.00 in 2011 and in later years. Hoyt testified that the $45,600 in costs savings for 2011 gives the Debtor a margin of error sufficient to pay creditors under Debtor's Plan.

The cut back in expenses on Ex. 12 include: $14,000 in savings by using volunteers rather than hired workers; $5,600 by eliminating free food and beverages to sponsors; $11,500 in attorney fees which she does not believe she will incur in 2011 because those fees were to retain an attorney to appear in the tribal court and Nevada state court; $6,500 for "southpoint" which Hoyt described were savings because she will not pay for hotel rooms for the workers; and $6,500 savings in headquarters office staff by using scholarship recipients instead of part-time help. She testified that volunteers are available to cut back the personnel expense by $14,000.

Hoyt was cross examined by Apache Gold's counsel about several of the reduced expense projections on Ex. 12. The $11,500 cut back in attorney fees will occur because she does not expect any further litigation in Nevada if the bankruptcy is successful. Hoyt testified that the $11,500 was for three attorneys who INFR had to hire, and they had to take that $11,500 out of

15

their event budget.

Debtor's report of administrative expenses was filed at Dkt. 128, and it estimates Debtor's total administrative expenses in the amount of $40,236.00.  Johnson states on Dkt. 128: "Debtor's undersigned counsel agrees to accept any amount of his law firm's court approved fees . . . at such time that payment of those residual fees fits into Debtor's budget . . . under any confirmed Chapter 11 Plan."  Hoyt testified that the Debtor intends to pay the Class Two creditors and administrative expenses this year.

Hoyt testified that ticket sales and revenues for INFR have increased every year for the 3 years since it moved the finals to Las Vegas, and are higher than they ever were when the finals was held at the Apache Gold resort.  Debtor projects that the INFR finals total revenue could increase to $642,500 by the year 2012, from the 2010 revenue shown on Ex. 9.  When asked on cross examination about this projected revenue increase, Hoyt testified that the increased revenue will come from increased sponsorships and ticket revenues.  Under cross examination Hoyt admitted that her projected increase in ticket sales is speculative, but is based on the historic performance such as shown on Ex. 22.  She testified that she factored in the current high price of gasoline in her projections.

With respect to the expenses on Ex. 12, Hoyt testified that the Debtor has assurances from the rodeo stock provider that the $84,440 stock expense will not increase for the next eight years.  She did not know whether insurance costs would increase, but she testified that insurance costs have not increased for the last five years.

Ex. 34 is the Debtor's MOR for April 2011.  Ex. 34 shows total income for the month of April 2011 in the sum of $55,400 which Hoyt deposited in the Debtor's DIP account.  She

16

testified that the Debtor had a cash on hand balance at the end of April in the amount of $53,647.41

Under questioning by the Court Hoyt testified that INFR is under contract with South Point Casino in Las Vegas for 2011 and later years, that INFR is receiving sponsorships beyond 2011, and that the regions have started organizing their regional rodeos.  Hoyt testified that the Debtor seeks to reorganize rather than dissolve and start over with a new entity because they want to try to rebuild its relationship with the San Carlos reservation and move forward.

Hoyt testified about the Debtor's liquidation analysis, which is Part XV in the original Disclosure Statement (Dkt. 62), at page 23.  Hoyt testified that the only assets which Debtor could liquidate are its office furniture and computers, which are listed on Schedule B as having a total value of $3,190.  She testified that INFR does not have a registered trademark for its name, and is aware of no value for the mark.

## DISCUSSION

Apache Gold objects to final approval of the Amended Disclosure Statement and objects to confirmation on the grounds of lack of a liquidation analysis, lack of feasibility, that the Plan is based on speculation and "hope", that Debtor has never shown a profit, that Debtor has not justified the separate classification of Apache Gold's unsecured claim, and based on the "absolute priority" rule under 11 U.S.C. § 1129(b)(2)(B).  Apache Gold further objects based on the treatment of its claim, excessive payment term, and Debtor's failure to pay it interest on its claim.

Debtor responds that 11 U.S.C. § 1122(a) forbids classification of dissimilar claims, and contends that Apache Gold's claim is dissimilar to Class Two claims because it is a large

17

judgement claim based on a contract, while Class Two claims are smaller and their continued support is necessary to Debtor's reorganization. Debtor argues that the separate classification is allowed so long as it is not unfair, and that business and economic reasons justify the separate classification. Debtor argues that its repayment terms meet its budget and projections, and that its Plan satisfies and is consistent with "how Chapter 11 works."

Certain of Apache Gold's objections can be disposed of summarily because they are inconsistent with the testimony and exhibits admitted into evidence. First, Apache Gold argues that INFR has never shown a profit. Ex. 14 and 15 show that INFR earned a net operating income in 2005, 2008, and 2009. INFR is, after all, a non-profit which depends to a large degree on the sale of sponsorships and contributions from members to carry out its mission to promote Indian rodeos. Apache Gold argues that INFR would not have shown a profit if South Point Casino had not accepted a sponsorship in lieu of debt. The Court finds little merit in that argument. The fact is that South Point Casino did accept a sponsorship in lieu of substantial debt. If South Point Casino decides to accept a sponsorship from INFR in lieu of debt in order to host INFR's rodeo event that brings in 500 contestants and their families to rent rooms and otherwise spend money on its premises, the Court finds such a decision is reasonable and consistent with a competitive and challenging business environment in Las Vegas. Ex. 22 shows beyond any doubt that, as far as ticket sales, moving the finals to the South Point Casino demonstrated sound business judgment by INFR.

The second objection which can be dispatched briefly is that the Debtor failed to provide a liquidation analysis. A liquidation analysis is provided in the Disclosure Statement, Ex. 62, at page 23, Part XV. That liquidation analysis is consistent with Debtor's Schedule B and Hoyt's

testimony that the only property INFR owns which could be liquidated is the office furniture and computer equipment scheduled at $3,190. No evidence exists in the record establishing that any other assets are available to liquidate, and Apache Gold failed to follow proper procedure to bring about a determination that the sponsorship money, prize money, and ticket sales were other than what Hoyt testified.

**I. Approval of the Amended Disclosure Statement.**

The Court conditionally approved the Debtor's Disclosure Statement after the Debtor amended it on April 21, 2011, adding P&L statements for years 2005, 2006, and 2007, event settlement sheets, other historical financial information, and federal tax returns for 2006 and 2007 to go with the 2009 return attached to the original.

Approval of a disclosure statement is governed by 11 U.S.C. § 1125(b). After notice and a hearing, a disclosure statement will be approved provided it contains "adequate information." Apache Gold's second memorandum (Dkt. 132) discusses its objections to confirmation of Debtor's Plan, but does not discuss its objections to the final approval of the Amended Disclosure Statement. Its first objection (Dkt. 113) argues that the Disclosure Statement fails to provide adequate information, including its mistaken contention that there is no liquidation analysis. Apache Gold's other objections overlap with its objection to confirmation and will be addressed below.

"Adequate information" as defined at § 1125(a) means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed

judgment about the plan . . . ."  *See Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 725 (Bankr. E.D. Cal. 1992).  The definition is somewhat misplaced when dealing with a non-profit like the instant Debtor.

Upon review of the Disclosure Statement, as amended, and attachments thereto, the Court finds and concludes that it provides adequate information and satisfies the requirement of § 1125(a)(1).  Apache Gold alone objected to approval of the Disclosure Statement.  None of the other creditors objected, and neither did the Office of U.S. Trustee on the grounds that it failed to provide adequate information.  The Court will grant final approval to the Amended Disclosure Statement.

## II.  Confirmation

### A.  Wrongful Classification of Apache Gold's Claim.

Apache Gold objects to confirmation on the basis that the Debtor wrongfully gerrymandered an accepting class by isolating Apache Gold's unsecured claim in Class One, and by classifying the other unsecured creditors into Class Two where all ballots submitted accepted the Plan.  Apache Gold argues that as no separate class should exist, the Debtor has not satisfied the requirement of 11 U.S.C. § 1129(a)(10) that at least one class of impaired claims has accepted the plan, determined without including acceptance by an insider.

Apache Gold argues that some of the accepting Class Two creditors are commissioners, and thereby are insiders.  Even if true, not all the accepting creditors were shown to be commissioners, such as Billings Clinic and the attorney Amesbury.  Willie Johns is a commissioner, but no evidence exists in the record that Creighton is a commissioner.  Hoyt testified that he is not a commissioner but rather is only a coordinator.

20

Apache Gold cites *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996), as authority that a debtor cannot classify unsecured claims separately.  The Ninth Circuit in *Barakat* discussed competing lines of authority on the issue, and concluded:

> We agree with the [*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III)*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992)] line of cases, that is, absent legitimate business or economic justification, it is impermissible for Debtor to classify LICV's deficiency claim separately from general unsecured claims.

99 F.3d at 1526; *see also Oxford Life Ins. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage)*, 166 B.R. 892, 897 (9th Cir. BAP 1994).

The Debtor argues that claims that are substantially similar can be designated in separate classes for administrative convenience under § 1122 which provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Debtor argues that the Class Two claims are not substantially similar to Apache Gold's judgment claim, that they are smaller claims, but more importantly, that it can designate a separate class because business and economic reasons justify the classifications even under the rule of *Barakat*, 99 F.3d at 1522.  Debtor argues that the Class Two creditors are supportive of the Debtor's reorganization by means of contributing loans or services, and are necessary for the Debtor's future rodeos, while Apache Gold is trying to put the Debtor out of business[6].

---

[6]Apache Gold's motives are hard to discern.  It opposes confirmation and receipt of $137,500 over 8 years under the Plan, and argues instead for dismissal so that it can levy against INFR's assets which are shown to be valued at $3,190 in the liquidation analysis.

The Ninth Circuit in *Barakat* recognized that "dissimilar claims may not be put in the same class." 99 F.3d at 1524; *In re Red Mountain Machinery Co.*, 448 B.R. 1, 6-7 n.6 (Bankr. D. Ariz. 2011). While the Class One and Class Two claims all are unsecured, the similarity ends there. Apache Gold's claim is substantially larger than the Class Two claims, and it stands to receive much more in payment under the Plan than the Class Two claims even though they are to be paid in full. Its claim also derives from a judgment.

The Court finds that legitimate business justifications exist for the Debtor to classify Apache Gold's claim separately from the Class Two unsecured claims, based mainly on the anticipated future aid or contributions of money and/or services by the Class Two creditors. It is clear from the record that the Debtor is relying on contributions from the Class Two creditors, and is relying on increased sponsorships to successfully reorganize, in addition to cutting payroll and other expenses. The Court finds that the Class Two creditors are essential to the Debtor's future rodeo operations, which distinguishes the instant case from the trade creditors, which were found not to be essential to the debtor's future in *Barakat*, 99 F.3d at 1528-29. Therefore, Apache Gold's objection that the Debtor has wrongfully classed creditors is overruled, and the Court finds that the Debtor has satisfied the requirement of § 1129(a)(10) of at least one accepting class of impaired claims.

### B. Absolute Priority Rule.

Apache Gold's original objection raises the "absolute priority" rule of § 1129(b)(2)(B), although it does not continue with that objection in its later briefing. Debtor argues that since it is a non-profit entity, the absolute priority rule does not apply, citing *In re General Teamsters, Warehousemen and Helpers Union, Local 890*, 265 F.3d 869 (9th Cir. 2001).

Because at least one impaired class of creditors has rejected Debtor's Plan, Debtor is seeking confirmation under 11 U.S.C. § 1129(b), which provides:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Two conditions exists for a judicial cram down under § 1129(b).  First, all requirements of § 1129(a) must be met, save for the plan's acceptance by each impaired class of claims or interests, *see* § 1129(a)(8).  Secondly, the objection of an impaired creditor class may be overridden only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1).  As to a dissenting class of impaired unsecured creditors, such a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if "the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property," § 1129(b)(2)(B)(ii).  *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441-42, 119 S.Ct. 1411, 1415-16 (1999).  According to § 1129(b)(2)(C)(ii), a plan is fair and equitable as long as the holder of any interest junior to the dissenting impaired class does not receive any property under the reorganization plan.

The Ninth Circuit in *General Teamsters* wrote:

The absolute priority rule is generally applied to for-profit corporations facing bankruptcy, where an equity owner seeks to retain property, often represented by

23

stock. [Citing cases]

* * * *

The only apparent circuit decision to deal directly with the issue of whether entities affiliated with a not-for-profit organization have equity interests for purposes of the absolute priority rule held that they did not because the essence of any equity interest was an ownership or an interest in the organization's profit. *See* [*Matter of Wabash Valley Power Ass'n*, 72 F.3d 1305, 1318-19 (7th Cir. 1995)].

265 F.3d at 873.

In the instant case the Debtor is a non-profit organization. Hoyt testified that no shareholders exist, and the board members and commissioners are paid no salaries and no members receive dividends. Her testimony is uncontroverted. *General Teamsters* remains binding authority in this Circuit, and under its holding Apache Gold's objection based upon the absolute priority rule is overruled.

## C. Feasibility.

Apache Gold's final objection is that the Debtor failed its burden of proof to show that its Plan is feasible. Apache Gold argues that Debtor's Plan did not sufficiently identify the amount being paid to it, and Debtor's budget did not include all expenses that will be incurred in the year 2011 rodeo. Lastly, Apache Gold objects that Debtor's Plan depends on increased donations, which "simply does not make sense" because sponsorships have declined since 2008.

Debtor's latest modified Plan specifies the payment to Apache Gold in the amount of $137,500 over 8 years, so that objection no longer applies.

The feasibility requirement is set forth at § 1129(a)(11) which requires that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further

24

financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." *In re Harbin*, 486 F.3d 510, 517 (9th Cir. 2007); *Prudential Ins. Co. of America v. Monnier Brothers (In re Monnier Brothers)*, 755 F.2d 1336, 1441 (8th Cir. 1985); *In re Roberts Rocky Mountain Equip. Co., Inc.*, 76 B.R. 784, 790 (Bankr. D. Mont. 1987). The Ninth Circuit BAP has defined feasibility as a factual determination, and "as whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Jorgensen*, 66 B.R. 104, 108 (9th Cir. BAP 1986), citing *In re Clarkson*, 767 F.2d 417 (8th Cir. 1985); *see also In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 657 (9th Cir. 1997).

Debtors bear the burden of establishing the feasibility of their plans by a preponderance of the evidence. *In re Hungerford*, 19 Mont. B.R. 103, 120, 2001 WL 36211305, *11 (Bankr. D. Montana), quoting *In re Thomas*, 243 F.3d 959, 963 (8th Cir. 2001); *see also In re Euerle Farms, Inc.*, 861 F.2d 1089, 1091-92 (8th Cir. 1988). The Court has a duty under § 1129(a)(11) to protect creditors against "visionary schemes." *Id.*; *In the Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). While a reorganization plan's success need not be guaranteed, the Court cannot confirm a plan unless it has at least a reasonable chance of success. *Hungerford*, 19 Mont. B.R. at 120, quoting *Thomas*, 243 F.3d at 963; *Monnier Brothers*, 755 F.2d at 1341.

Apache Gold objects that Debtor failed its burden to show that its Plan is feasible because the record shows that the sponsorships and donations have declined, and Debtor's budget did not accurately reflect expenses such as how Johnson's attorney fees and other expenses would be paid. Ex. 22 shows that ticket sales have increased consistently for the Debtor since 2005, and have increased every year since Debtor moved the finals rodeo to Las Vegas. Ticket Sales in 2010 were $170,717.00. Debtor has a long term agreement with the South Point Casino to host

25

the rodeo, and South Point Casino has invested in the success of the event by accepting a sponsorship in lieu of debt, which Hoyt testified could continue in the future. Hoyt also established that the Debtor has had no increase in its insurance for 5 years and does not expect future increases, and that the Debtor has received assurances that stock costs would not increase.

Ex. 22 shows a decline in sponsorships every year since 2008. However, Hoyt testified that the sponsors were aware of, and likely were affected by, Apache Gold's aggressive attempts at collection. Even though the sponsor money and ticket sales were earmarked for prize money or rodeo expenses, and have not been shown to be property of the estate under proper procedure, the evidence shows that Apache Gold attempted to levy against the prize money. Apache Gold's collection efforts, therefore, are shown by the evidence to be a significant reason for the decline in sponsorships since 2008.

With the Debtor able to resolve Apache Gold's claim in this Chapter 11, Apache Gold will no longer threaten to levy against sponsorship money or entry fees. The Debtor expects, and the Court agrees, that it is possible that sponsorships will recover and increase, improving the Debtor's chances at completing its Plan.

Ex. 12 shows that the Debtor can cut back its event expenses by $45,600.00 by the use of volunteers and other economies. Hoyt corroborated the cutback amounts in her testimony. Apache Gold offered no evidence that the cutbacks were not possible. Finally, with respect to Johnson's attorney fees, he has agreed in his report of administrative expenses (Dkt. 128) that he agrees to accept any amount of his approved fees "at such time that payment of those residual fees fits into Debtor's budget . . . under any confirmed Chapter 11 Plan."

Therefore, based on the exhibits and testimony, the Court finds that the Debtor has

26

satisfied its burden of proof under § 1129(a)(11) to show, by a preponderance of the evidence, that its Plan is feasible and is not likely to be followed by liquidation or the need for further reorganization.

## CONCLUSIONS OF LAW

1.   This Court has exclusive jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).

2.   Confirmation of Debtor's Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3.   Debtor's Amended Disclosure Statement provides adequate information and satisfies 11 U.S.C. § 1125(a).

4.   Debtor did not wrongfully classify Apache Gold's unsecured claim.

5.   Debtor satisfied the requirement of 11 U.S.C. § 1129(a)(10) that at least one class of claims that is impaired under the Plan has accepted the Plan.

6.   The absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii) does not apply to non-profit entity such as the Debtor in the instant case.

7.   The Debtor satisfied its requirement under 11 U.S.C. § 1129(a)(11) to show that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization.

8.   The Debtor satisfied all other requirements for confirmation of its modified Plan under 11 U.S.C. § 1129(a) and (b).

**IT IS ORDERED** a separate Order shall be entered in conformity with the above overruling Apache Gold's objections, granting final approval to the Debtor's Amended

27

Disclosure Statement (Docket Nos. 62 and 92) and confirming Debtor's First Amended Chapter

11 Plan (Docket Nos. 61, 109, and 127).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

28